Filed 10/31/23  P. v. Chapman CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH ROBERT CHAPMAN,<br><br>    Defendant and Appellant. | F084440<br><br>(Super. Ct. No. CR-19-004885)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Dawna Reeves, Judge.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION AND BACKGROUND

The Stanislaus County District Attorney filed an information on June 21, 2021, charging defendant Joseph Robert Chapman with murder (Pen. Code, § 187, subd. (a);[1] count 1), committed while defendant was engaged in the commission of sodomy and the attempted commission of rape (§ 190.2, subd. (a)(17)(C), (D)), and also alleging that defendant had been released on bail pending judgment as to two separate felony offenses when he committed the murder (§ 12022.1). Defendant pleaded not guilty and denied all special circumstances and allegations.

A jury convicted defendant of murder and found true all special circumstances on April 25, 2022, after a 15-day trial. The trial court then granted the prosecutor's motion to strike the section 12022.1 enhancements, which had been bifurcated. The trial court sentenced defendant to life in prison without the possibility of parole and ordered him to pay victim restitution (§ 1202.4, subd. (f)), a $2,500 restitution fine (§ 1202.4, subd. (b)), a $30 criminal conviction assessment (Gov. Code, § 70373), and a $40 court operations assessment (§ 1465.8).

Defendant filed a timely notice of appeal on May 26, 2022. On appeal, defendant argues that the trial court abused its discretion in admitting into evidence a trial witness's text messages as prior inconsistent statements and that the evidence was not sufficient to prove that defendant committed murder during the course of an attempted rape. We reject defendant's arguments and affirm the judgment.

## FACTS

On the morning of May 13, 2019,[2] record store owner Cornell Militaru found Christina Hill dead behind his record store on the corner of G and 18th Streets in Modesto. Hill was homeless and lived with her boyfriend Dean Keith in a tent they

---

[1] Undesignated statutory references are to the Penal Code.

[2] Subsequent references to dates are to dates in the year 2019, unless otherwise stated.

shared and set up each night. Keith last saw Hill at approximately 9:30 or 10:00 p.m. on May 12 when she left to go to a convenience store. While he initially followed her to ensure her safety, Keith did not actually see Hill enter the convenience store and never saw her again. The convenience store was located approximately one block from Militaru's record store where Militaru found Hill's body.

Militaru arrived at the record store on May 12 with his girlfriend in her car. They parked behind the store and in front of a fence that blocked off the store's back door. Militaru and his girlfriend were outside behind the store until approximately 10:30 p.m. and then went inside and slept in the front of the store between 12:30 and 1:00 a.m. At approximately 10:40 a.m. to 10:53 a.m. the next day, Militaru went out the back of the store and saw a bloody white T-shirt near the gate. When he opened the gate, Militaru saw Hill, who was partially naked on the ground in front of his girlfriend's car, and scattered clothing and blood everywhere. He told his girlfriend to call 911.

Jessica Gonzalez and Rafael Lopes lived next door to the record store. Gonzalez was cleaning inside the residence and thought she heard a scream at approximately 9:00 p.m. Believing it was one of her children, she asked Lopes why he was not responding. Lopes told her the neighbor was responsible for the noise, and she continued cleaning. Between 11:00 p.m. and 12:00 a.m., Gonzalez looked out of her second-story window and saw someone having intercourse next door. The man was facing the wall, to the right side of the record store, on his knees and moving back and forth. The man was wearing a polo shirt, had a tattoo on his left arm, and had a ponytail.

Gonzalez woke Lopes, who had fallen asleep sometime after 9:00 p.m., and told him someone was having sex in the driveway next door. At approximately 1:00 a.m., Lopes woke and heard a woman say, "Please. Don't. Stop. Please don't hurt me." The woman also said, "You don't have to do this," but she was not screaming loudly or asking for help.

3.

Law enforcement collected video surveillance from several cameras located in the area of Hill's body between 8:00 p.m. on May 12 through 4:00 a.m. on May 13. Video showed defendant walking down G Street with an unidentified woman, crossing 18th Street, and approaching the convenience store at 12:35 a.m. The woman separated from defendant on the sidewalk and walked toward the convenience store. Hill passed defendant and the woman as she walked in the same direction and eventually entered the convenience store at 12:42 a.m. Defendant ran into the convenience store at approximately 12:43 a.m. and put on a long-sleeved, hooded shirt bearing the word "Backwoods" once he was inside. According to a convenience store employee, defendant acted aggressively as if he was on drugs, and the employee asked defendant to cool down and not start a fight.

Video showed Hill inside the convenience store carrying a backpack that was later found at the murder scene, getting a cup of coffee, and also making a phone call. Defendant left the store at approximately 12:47 a.m. Hill walked from the store and toward G Street at approximately 12:50 a.m. She carried a cup in one hand and a white plastic Smart & Final bag in the other hand and wore a backpack. Video showed defendant following Hill down the street and running to catch up with her. Hill and defendant walked out of sight of the camera at the corner at G and 18th Street.

Officers responded to the murder scene on May 13 at approximately 12:06 p.m. Hill's body exhibited massive head wounds and was located in front of a vehicle. Clothing and personal items were strewn around Hill's body. Hill was wearing only one sock and a shirt pulled up to her shoulders. A large amount of blood was also found on the passenger side of the vehicle near the wall of the record store. Police found a single piece of men's clothing near the body, a gray hooded shirt with the word "Backwoods" on the front, and its sleeves were saturated with blood. After discovering video of defendant in the convenience store wearing the shirt, police released defendant's photograph as a person of interest in the murder.

4.

Defendant was arrested four days after the murder. He had scratches and abrasions on his hands, elbows, knees, and chest and bruising on his chest. He was wearing tennis shoes that appeared to be those that defendant wore in the convenience store video. Officers searched defendant's home and vehicle but did not find a shirt similar to that worn by defendant in the convenience store video, but they did recover the hooded shirt with the word "Backwoods" at the murder scene.

Defendant's DNA was found on the shirt recovered at the murder scene, in sperm from Hill's rectal swab, and in a scraping from Hill's fingernail. Blood was identified on defendant's shoe but could not be identified with any specific individual.

Police also located a box for a cellular phone but did not find the phone at the murder scene. However, the phone was tracked and located in the possession of an individual who had obtained the phone from Samuel Jones.

Jones testified that he knew both Hill and her boyfriend and had sold them small amounts of methamphetamine. Jones had been to the convenience store earlier in the evening, and his friend, Jessica Chisum, had left her phone there. Jones rode his bike back to the convenience store and retrieved the phone at approximately 1:46 a.m. On his way home, Jones saw a white bag from Smart & Final on the sidewalk at the corner of G and 18th Streets and picked it up. The bag contained Hill's EBT card, women's clothes, a cold bottle of iced tea, and a phone. While turning his bike around on 18th Street, Jones heard a wail or cry and saw somebody slumped over at the end of the driveway. A shirtless and tattooed man was sitting slumped over near the right-side wall of the building and did not respond when Jones asked whether he was okay. The man had light brown hair and looked like the person in the police surveillance photograph.

According to Chisum, Jones returned home with some items he had found, including a phone. When they used the found phone to call Jones's phone, they discovered that Jones's phone number was stored in the found phone's contacts and

recognized Hill's name as someone they knew. However, they gave the phone to someone else rather than return it.

Bailee Alias,[3] defendant's stepdaughter, testified at trial that she did not see defendant return home wearing women's clothing after Hill was killed, did not know whether defendant came home wearing women's clothing, and did not know whether defendant had blacked out that night. Bailee also testified that defendant did not tell her that he had been in a fight a few days before his arrest on May 17, 2019. Under further questioning by the prosecutor, Bailee admitted that she had sent a text message to her mother after defendant's arrest that stated, "Mom, he came home in a woman's shirt. It's not a coincidence that same night [defendant] blacks out." Bailee also testified that she texted her mother a few minutes later, "That doesn't change the fact that he did black out and beat the shit out of someone and came home bloody."

When asked about the text messages, Bailee testified that the day defendant was arrested, she had read articles online, learned that defendant was a person of interest in a murder, and believed that the "Backwoods" shirt referenced in the articles belonged to a woman.[4] She also testified that her brother, Robert Alias, told her that defendant had been involved in a fight and returned home bloody and that defendant did not tell her these facts.

Robert testified that he spoke with a police officer about defendant during a police search of his family's residence after defendant's arrest, but Robert did not recall what he had said because he has a bad memory and it was a traumatic event. Robert admitted that after the officer told him defendant was going to jail for murder, Robert told the officer,

---

[3]    We refer to witnesses Bailee Alias and Robert Alias by their first names for clarity and convenience, because they share a last name. No disrespect is intended.

[4]    A men's shirt, bearing the word "Backwoods," was found near Hill's body. Police obtained surveillance video from the convenience store that showed defendant wearing this shirt. Police never released information to the public that the shirt was located at the crime scene, although police may have referred to the person of interest having worn such a shirt.

"One day [five or six days prior] he showed up with a very swollen and busted up hand." Robert testified that he did not recall telling the officer that defendant was wearing a new pair of clothes when he returned home, but then testified that defendant wore clothes that Robert had not seen previously, although he denied there was anything unusual concerning the clothing. Robert testified that he did not remember defendant coming home five or six days before his arrest in changed clothes and with swollen and busted hands.

The prosecutor questioned Robert regarding defendant's statements to Robert when defendant returned home and the text messages Robert sent to his mother, which reflected these statements. Robert testified that he could not remember either defendant's statements or his own text messages but, upon reviewing the text messages, Robert testified that defendant "was distraught about blacking out and then coming to. Like as if he was attacked and knocked down." Robert testified that defendant said he had been attacked and that he may have hurt someone, but Robert did not think much of it. Robert explained that while he texted his mother that defendant bragged about killing people, he had misinterpreted what defendant really said because he is illiterate. When asked about defendant's hands, Robert testified that defendant's hands were bruised and scratched, but Robert had bad eyes and could not really tell. Robert admitted that while he might have told an officer that defendant's hands had been swollen, he does not remember whether they actually were swollen and may have said so just to get the officers out of the house and return his life to normal. Robert admitted he told an officer that defendant's hands were bruised and had definitely been "thrown against something a bunch of … times," but Robert claimed that he was exaggerating and said he was not a doctor.

Michael Ferenc, a forensic pathologist working for the Stanislaus County Sheriff's Department Coroner's Division, testified that Hill's injuries included: blunt force injuries to the face; large abrasions on her forehead and right side of her face; lacerations on her

7.

head, forehead, and chin; contusions and abrasions on her neck; and the bone of Hill's lower jaw could be seen coming through the back of her head.  Ferenc testified that Hill had abrasions on her hips, back, and pubic area and extensive contusions and abrasions on her arms, legs, feet, knees, and the back of her wrists.  Ferenc identified photographs showing abrasions across Hill's forehead and covering the right side of her face that reached her chin.  There were lacerations on the right and back sides of her scalp.  Pinpoint hemorrhages in Hill's eyes were consistent with signs of asphyxia.  She had dramatic bruising over her entire scalp but no skull fractures.

Ferenc concluded that multiple blows to the head produced external abrasions and that force caused bruising to Hill's scalp.  While he did not observe repetitive injuries consistent with having been hit by an object, Ferenc testified that Hill appeared to have been slammed into the pavement or a wall.  He observed evidence of blood on the wall, as if her hair had been dragged across the bricks.  The hyoid bone in Hill's neck was compressed so hard that it caused hemorrhaging in the muscle around it.  Hill's neck had bruising behind her jaw consistent with fingernails or fingers.

Ferenc testified that Hill's vagina, anus, and rectum did not show any injury but that the bruising on her right and left hips, and above her vagina, was consistent with sexual assault and caused before death.  The majority of time, sexual assault does not result in injury to the sexual organs.  The bruising on the back of Hill's wrists was consistent with manual restraint of her wrists.  Hill died of asphyxia due to strangulation and blunt injuries.

Defendant presented expert testimony of Brent Turvey, a forensic criminologist, that the individual who killed Hill would have been dripping with blood based on the impact spatter seen on the walls, but defendant's clothing and shoes did not have blood spatter.  Turvey opined that Hill had been fully clothed when killed because blood was found on her clothing and, therefore, she had not been sexually assaulted at the same time she was attacked.  Turvey also opined the crime displayed an anger consistent with the

8.

suspect having known Hill, and the killer took off Hill's clothes and emptied her backpack because they were searching for something. Turvey believed that Hill's phone had been removed by the individual who killed her.

Modesto Police Detective Gary Guffy testified that the clothing Hill wore that evening was not, in fact, covered in blood. Ferenc, the forensic pathologist who autopsied Hill, also had experience with blood spatter. He disagreed with Turvey that the killer would have had spatter on their clothing because the spatter found on the vehicle and walls was not sufficient to indicate that the killer would have been covered in spatter; the absence of bloody footprints at the crime scene similarly demonstrated the unlikelihood that the killer was covered in spatter.

Defendant presented the testimony of Kelly Doorneweerd, who was seeking materials to recycle near the murder scene between 12:00 a.m. and 2:00 a.m. He saw two people near a vehicle that he believed had been backed into the driveway. The man was on top of the woman, her head was near the vehicle's front tire, and her feet were toward the back of the driveway. Doorneweerd believed the individuals were having sex. The man was not wearing a shirt, had short hair, and was straddling the woman who was gurgling as the man hit her on the chest. The man had at least one hand on the woman's throat, was hitting her on the chest hard, and was taking the air out of her based upon the gurgling noise and choking sound that Doorneweerd heard.

Doorneweerd walked away and arrived at the convenience store where he later ran into a friend. A man ran from the corner of G and 18th Streets and asked Doorneweerd to call 911 because he said that he had been having sex and there was a lot of blood. The man looked like the same individual he had seen with the woman. He later saw the man wearing a tight shirt and having an argument with someone on bicycle. Doorneweerd identified the man as the person of interest in the convenience store video, although he was not positive.

9.

After Doorneweerd testified, the prosecution presented additional video evidence that showed an individual walking to the corner of G and 18th Streets at approximately 3:20 a.m., peeking down 18th Street, then walking toward the convenience store. Defendant walked toward the convenience store from around the corner, and the first individual crossed the street and ran toward the convenience store. Defendant then crossed the street and turned into a business located just before the convenience store at approximately 3:21 a.m. Defendant was no longer wearing the "Backwoods" shirt. Video showed defendant a few minutes later threatening an individual who then ran down the street and into the convenience store where he stayed for 20 minutes. Modesto Police Detective Philip Weber viewed the video but could not determine whether Doorneweerd was depicted.

## DISCUSSION

**I. The trial court did not abuse its discretion in admitting evidence of Bailee's text messages as prior inconsistent statements but, even if the trial court erred, the error was harmless.**

### A. Background

Defendant moved to exclude text messages between his wife and stepdaughter, Bailee, arguing they were irrelevant hearsay. The prosecutor indicated that she would use the text messages to impeach Bailee during her testimony. The prosecutor advised that Bailee had texted her mother that she read an article on the internet that included a "video of [defendant] in a liquor store near where the lady was found dead with a head injury." Bailee, using her boyfriend's phone, texted her mother, "Did [defendant] tell you about the Modesto Bee article I found?" Bailee's mother responded, "Yes, I know. It's all over the Internet. He is turning himself in tomorrow." Bailee texted, "[T]his is a video of him in a liquor store near where the lady was found dead with a head injury." Bailee's mother indicated that she had read the article, and Bailee responded, "Okay.…

10.

[Defendant] came home in a women's shirt." Bailee also texted that defendant "beat the shit out of someone and came home bloody."

Defense counsel objected specifically to one message in which Bailee stated that defendant returned home with blood on his hands because Bailee never stated in the message that she saw defendant with blood on his hands and may have heard the information from someone else. The trial court ruled that Bailee's text messages could be admitted as either prior consistent or inconsistent statements depending upon her testimony. The court explained, "It's a prior—it will be a prior consistent or prior inconsistent statement depending on what her testimony is. [¶] But as long as she testifies, the basis of her knowledge is not as important as what she says on the stand, and whether or not it's consistent or inconsistent with her prior statement. It would be hearsay if she didn't testify and [the] People were trying to use it."

Before Bailee testified, defense counsel again objected to Bailee's text messages, which stated that defendant was wearing a women's shirt and had bloody hands when he returned home. The trial court opined that if Bailee made those observations but testified that she did not, then the text messages would not be hearsay. Defense counsel argued that the text messages did not state that Bailee had actually witnessed the events and that she was relaying information from someone else when she texted her mother. The trial court held that the text messages indicated that Bailee was communicating something that she had observed and, if Bailee testified that she did not make those observations, then the prosecution could use the text messages to impeach Bailee and argue that she sent the messages because she had, in fact, made the observations she described therein.

### B. Applicable Law and Standard of Review

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is not admissible unless it meets the requirements of one of the exceptions set forth in Evidence Code sections 1220–1390. (Evid. Code,

11.

§ 1200, subd. (b); see also *People v. DeHoyos* (2013) 57 Cal.4th 79, 132.) A trial court's ultimate ruling on admissibility "implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute." (Evid. Code, § 402, subd. (c).) We review the trial court's conclusions regarding foundational facts for substantial evidence and its decision to admit or exclude a hearsay statement for abuse of discretion. (*DeHoyos*, at p. 132.) We review the ruling, not the rationale; "[t]he ruling must be upheld if the evidence was admissible under any hearsay exception." (*People v. Karis* (1988) 46 Cal.3d 612, 635.) Our analysis may differ from that of the trial court because " 'we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11.)

"A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770.[5] The 'fundamental requirement' of [Evidence Code] section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony. [Citation.] Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event. [Citation.] However, courts do not apply this rule mechanically. 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement [citation], and the same principle governs the case of the forgetful witness.' [Citation.] When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a

---

**5** "Evidence Code section 1235 provides as follows: 'Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770.'

"Evidence Code section 770 provides: 'Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action.' "

reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219–1220, sixth bracketed insertion in original.)

### C. Analysis

The trial court admitted Bailee's text messages because they indicated that Bailee had knowledge of defendant's appearance when he returned home, and Bailee testified that she did not see defendant return home and had learned the information from Robert. If the jury believed that Bailee saw defendant return home and she texted her observations to her mother, then Bailee's testimony that she did not observe defendant was inconsistent with her prior text messages to her mother. (See *People v. Cowan* (2010) 50 Cal.4th 401, 462 [test for whether a witness's prior statement is inconsistent with prior testimony is whether the statement is inconsistent in effect rather than an express contradiction of terms].) The trial court did not abuse its discretion in concluding that Bailee's text messages indicated that she had observed defendant when he returned home and could be used to impeach her testimony that she did not see defendant when he returned home.

Alternatively, Bailee testified that she obtained information regarding defendant's appearance when he returned home from both Robert and online news articles. The evidence demonstrated that information pertaining to defendant's appearance after the murder had not been provided to the public. Therefore, if the jury believed Bailee, then she learned information pertaining to defendant's appearance when he returned home from Robert. Robert testified that he made statements to the police that defendant had returned home wearing different clothing and that defendant's hands were bloody and bruised. However, Robert also testified that his statements to the police were exaggerated and made because he was upset that his residence was being searched. Statements that Robert made to Bailee, as reflected in her text messages, were admissible

13.

to impeach Robert's retraction and explanation of his prior statements because he made them to Bailee before he spoke with the police the evening of defendant's arrest.

Even assuming that the trial court erred in admitting Bailee's text messages into evidence, we conclude it is not "reasonably probable that a result more favorable to [defendant] would have been reached" had the messages been excluded.[6] (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Seumanu* (2015) 61 Cal.4th 1293, 1308–1309 [applying *Watson* standard to purportedly erroneous admission of hearsay evidence].) Evidence of defendant's guilt was very strong, and admission of Bailee's text messages were unlikely to affect the jury verdicts. Video evidence showed defendant followed Hill to the area where her body was later found. Additional surveillance showed defendant left that area wearing a different shirt. When defendant was arrested several days after the murder, he had wounds on his knuckles and bruises on his legs, hands, and chest that were consistent with having been engaged in a fight or struggle. The shirt defendant wore while in the convenience store with Hill was found discarded near Hill's body. Significantly, defendant's seminal fluid was identified in Hill's rectum, and his DNA was found under her fingernails.

Furthermore, Robert's testimony and prior statements to police were properly admitted and included information that defendant had returned home wearing new clothes, defendant's hands were swollen and bloody, and defendant bragged to Robert that he had killed someone. While these statements are not identical to Bailee's text messages, they contain similar information. Accordingly, any potential prejudice occasioned by the admission of Bailee's text messages into evidence was minimal.

---

**6** Defendant argues that the erroneous admission of hearsay evidence can violate a defendant's right to confrontation, implicating the *Chapman* standard of review, citing *Chapman v. California* (1967) 386 U.S. 18, 24. Because Bailee was available for cross-examination, the confrontation clause of the United States Constitution is not implicated. (See *People v. Rodriguez* (2014) 58 Cal.4th 587, 632.) Therefore, we decline to evaluate the harmlessness of the trial court error under *Chapman*'s more stringent standard of review.

14.

We conclude that, under the circumstances, it is not "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## II. The jury's finding that defendant killed during the commission of an attempted rape is supported by sufficient evidence.

### A. Applicable Law and Standard of Review

" ' "In reviewing the sufficiency of evidence for a special circumstance"—as for a conviction—"the question we ask is whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt." ' [Citation.] 'In a case, such as the present one, [where the finding is] based upon circumstantial evidence, we must decide whether the circumstances reasonably justify the findings of the trier of fact, but our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment.' " (*People v. Cain* (1995) 10 Cal.4th 1, 37, first bracketed insertion added, fn. omitted (*Cain*), overruled on other grounds in *People v. Moon* (2005) 37 Cal.4th 1, 17.)

"Forcible rape is a general intent crime involving an act of sexual intercourse accomplished against the victim's will by means of force or fear. (§ 261, subd. (a)(2).) An attempt to commit rape has two elements (see § 664): the specific intent to commit rape, and a direct but ineffectual act done towards its commission. [Citation.] Such act cannot be merely preparatory, and must constitute direct movement towards completion of the crime. [Citation.] However, attempted rape does not necessarily require a physical sexual assault or other sexually ' "unambiguous[ ]" ' contact." (*People v. DePriest* (2007) 42 Cal.4th 1, 48, third bracketed insertion in original.)

### B. Analysis

Defendant argues that the record is devoid of evidence of specific intent to rape. A rational jury, however, could have concluded otherwise. In *Cain*, the victim's "body

was found in a position and state of dress suggestive of rape or some type of sexual assault." (*Cain*, *supra*, 10 Cal.4th at p. 45.) Pubic hairs similar to Cain's were found in the victim's clothing. (*Ibid*.) However, an expert did not detect sperm or seminal fluid from the victim's vaginal swabs and, while these findings did not rule out a rape, he was unable to definitely opine that the victim was definitely raped. (*Id*. at p. 25.) Our Supreme Court concluded that the jury could have rationally concluded that Cain partially unclothed himself and the victim for the purpose of sexual intercourse and found sufficient evidence of Cain's intent to rape. (*Id.* at p. 45.)

In the instant case, as in *Cain*, Hill was found in a position and state of undress "suggestive of rape or some type of sexual assault." (*Cain*, *supra*, 10 Cal.4th at p. 45.) In addition, Ferenc testified that he found bruising on Hill's pubic area consistent with sexual assault. Defendant argues that the evidence only supports an intent to commit sodomy, as confirmed by defendant's semen found in Hill's rectum. However, Doorneweerd testified that he saw defendant straddling Hill and hitting her chest, indicating that Hill was on her back during a portion of defendant's attack. Doorneweerd also believed that the individuals were having sex. Therefore, the jury could have reasonably concluded that while defendant sodomized Hill, he also attempted to rape her.

## DISPOSITION

The judgment is affirmed.

HILL, P. J.

WE CONCUR:


DETJEN, J.


PEÑA, J.

16.